# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Phillip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50559 | **DATE** | 10/25/2004 |
| **CASE TITLE** | Markgraff vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10)■ [Other docket entry] For the reasons stated on the attached Report, it is the Magistrate Judge's Report and Recommendation that Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary Judgment on the administrative record and pleadings be granted. Parties are given ten days from service of this order, as calculated under Rule 6, to file objections with Judge Reinhard, pursuant to FRCP 72. Objections need not be presented as stated in LR. 5.

(11) ☑ [For further detail see order ~~on reverse side of~~/attached to) the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **3** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | 10-27-04 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 11 |
| | Mail AO 450 form. | | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | | 10/25/2004 | |
| | | | date mailed notice | |
| AM | courtroom deputy's initials | | GG | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| TERRY MARKGRAFF, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 50559 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JOANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Terry Markgraff ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision partially denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). 42 U.S.C. §§ 416, 423. This matter is before the Magistrate Judge for Report and Recommendation pursuant to Rule 72(b) of the Federal Rules and 28 U.S.C. § 636(b)(1)(B).

## I.     BACKGROUND

Plaintiff filed for DIB on November 19, 2001 (Tr. 131), and his application for benefits was denied on January 11, 2002. (Tr. 94). Plaintiff filed a request for reconsideration on February 22, 2002, and his application was denied after reconsideration on April 1, 2002. (Tr. 14). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on April 11, 2002. (Tr. 94). Plaintiff appeared, with counsel, before an ALJ on January 28, 2003. (Tr. 22). In a decision dated February 28, 2003, the ALJ found that Plaintiff was entitled to DIB

commencing September 10, 2002, but not since November 1, 1998, when Plaintiff alleged disability. (Tr. 22-30). On October 10, 2003, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 11). On November 14, 2003, the Appeals Council denied Plaintiff's request for review. (Tr. 5-7).

## II.   FACTS

Plaintiff was born on February 6, 1946, making him fifty-six years old at the time of his January 28, 2003, hearing before the ALJ. (Tr. 37, 192). Plaintiff completed his education through the twelfth grade. (157). At the time of his hearing, Plaintiff lived with his wife. (Tr. 38). Plaintiff is approximately six foot five inches tall and weighed, at the time of the hearing, 220 pounds. (*Id.*). Plaintiff's primary impairments noted by the ALJ were coronary artery disease, hypertension, and gastroesophegeal reflux disease. (Tr. 28).

Plaintiff had no reported income since November 1, 1998. (Tr. 42). Plaintiff was self-employed from 1969 to November 1, 1998, with his trucking company, Markgraff Trucking. (Tr. 44). Plaintiff was the only employee of the company, and he worked eight to ten hours a day, five days a week. (Tr. 45). He drove a tractor trailer, completed his own loading and maintenance, and completed his own paperwork. (Tr. 45-47). Plaintiff received $35,000.00 a year for his services. (Tr. 128). Plaintiff stated that he stopped working due to fatigue and inability to put in the hours required to maintain his business arising from his heart problems. (Tr. 41).

Plaintiff described his typical day since he stopped working as being filled up with small domestic chores. (Tr. 48). Plaintiff dusts, does laundry, vacuums, cooks, cuts grass, washes his car, and occasionally shops with his wife. (*Id.*). Plaintiff also visits with family and friends occasionally. (Tr. 48-51). Plaintiff stated that he gave up his hobby of golf because of fatigue.

2

(Tr. 49). However, Plaintiff does exercise on a treadmill for five minutes at a time a few times a week. (Tr. 67-68).

Plaintiff testified that his heart problems cause him chest pain and fatigue. (Tr. 57). Plaintiff also stated that he has to perform chores at his own pace, which requires breaks of approximately fifteen to twenty minutes after any sustained activity. (Tr. 51, 67). Because of his symptoms, Plaintiff avoids sustained activity for more than twenty or thirty minutes. (Tr. 57). Plaintiff takes naps in the afternoon if he is drowsy. (Tr. 62).

Plaintiff stated at his hearing that he also suffers from hypertension, which causes headaches when his blood pressure goes up. (Tr. 58). Aggravation and stress tend to make Plaintiff's blood pressure go up. (*Id.*). Plaintiff reported that driving in traffic causes him stress. (Tr. 64). Additionally, Plaintiff has acid reflux problems related to stress and strenuous work. (Tr. 59). Plaintiff reported esophageal burning approximately three to four times a month. (*Id.*).

At Plaintiff's hearing, the ALJ questioned Plaintiff about his drinking and smoking habits. (Tr. 60). Plaintiff reported that he drinks a six-pack of beer every day, but noted that he stopped smoking after heart surgery in 1997. (Tr. 61). Plaintiff reported that his doctors instructed him to stop drinking because of his blood pressure, but Plaintiff noted that his blood pressure did not go down during the time that he did try not drinking. (*Id.*).

At the time of Plaintiff's hearing, he took four prescription medications, as well as Aspirin and Vitamins C and E. (Tr. 185). Plaintiff took Nifedipine twice a day for hypertension, Atenolol once a day for hypertension, Lipitor once a day for cholesterol, and Procardia once a day for acid reflux. (*Id.*). Plaintiff also used Prevacid and Pepcid for acid reflux, and he used Nitroglycerin in the past but has not needed to refill his original prescription. (Tr. 53-54, 60).

Plaintiff represented that he could stand continuously for thirty minutes (Tr. 69), sit for an hour at a time (*Id.*), walk two blocks at a time, and lift up to ten pounds occasionally throughout a day. (Tr. 70). Plaintiff reported that walking up a flight of stairs would cause him to be short of breath and light headed. (Tr. 72).

When questioned about the lack of complaints in his medical record, Plaintiff stated he was "not a complainer." (Tr. 56). He stated that he was afraid to go in for a bypass, so he did not notify his doctor of how bad his fatigue was bothering him. (*Id.*). Plaintiff also noted that he was the one who requested testing in September, 2002, because he knew he was having difficulties. (Tr. 57).

Vocational expert, Susan Ettenberg, testifying before the ALJ stated that Plaintiff's work history of owning and operating a tractor trailer was heavy, semi-skilled work. (Tr. 73-75). Ms. Ettenberg noted that the DOT generally classifies driving a tractor trailer as medium work, but recognized that many times, the position is better classified as heavy. (Tr. 75). The ALJ then questioned Ms. Ettenberg about the existence of work positions available to the Plaintiff in the region (Chicago plus nine counties). (Tr. 71-72, 77). Specifically, the ALJ asked Ms. Ettenberg whether a hypothetical male, with the following characteristics, could perform prior work:

> is between the ages of 52 and 56 years, has a high school education
> with the ability to read, write, and use numbers, has the same prior
> work history as the claimant in this case with the capacity to
> perform work with the following and no other additional
> limitations. Let's assume that lifting and carrying will be limited
> to maximum of 50 pounds on an occasional basis and 10 or 25
> pounds frequently. Sitting, standing, and walking respectively,
> and with normal breaks could be performed up to six hours each in
> a normal eight hour day. And looking at postural activities, let's
> assume that climbing, balancing, kneeling, stooping, crouching,
> and crawling could be done on no more than a frequent basis in the
> eight hour work day.

(Tr. 76).

Ms. Ettenberg testified that such a hypothetical male could still perform the work at a medium level semi-truck driver position. (*Id.*). The ALJ then modified the hypothetical such that lifting was limited to twenty pounds occasionally, ten pounds frequently, and postural activities were limited to only occasionally. (*Id.*). Ms. Ettenberg replied that the Plaintiff would not be able to perform past work with the additional limitations. (Tr. 77). The ALJ then inquired into other jobs that Plaintiff could transfer his existing driving skills, but which are classified at a light level of exertion. (*Id.*). Ms. Ettenberg replied that such jobs existed driving smaller trucks and vans. (*Id.*). Such jobs would be semi-skilled delivery jobs, which the vocational expert estimated as existing in the region for 2,000 to 3,000 workers. (Tr. 78). Ms. Ettenberg also suggested that 5,000 school bus driver positions existed in the region, but that such positions were generally considered part-time. (*Id.*).

The ALJ further modified his hypothetical to limit lifting to ten pounds occasionally and five pounds frequently. (Tr. 80). The vocational expert testified that such a limitation would eliminate the light delivery jobs, but would not affect the school bus driving positions. (*Id.*). Ms. Ettenberg also testified that other light jobs existed in the economy that were unskilled, such as assembly (4,000 jobs), packing (2,000 jobs), and cashier (3,000 jobs) positions. (Tr. 81). The ALJ then further restricted the hypothetical to limit standing and walking to no more than an hour continuously without being able to sit for a minute or two. (Tr. 82). The ALJ testified this would not impact any of the transfer jobs, but it may impact ability to complete prior work. (Tr. 83). Finally, the ALJ proposed the following set of limitations:

> Stand and walk for no more than a combined total of two hours in
> an eight hour day, would need periods of walking around at
> intervals of 60 minutes for 15 minutes on each occasion. Although

5

this appears somewhat inconsistent with sitting for 30, for one
hour, would need an at will option for sitting and standing, would
need unscheduled breaks once or twice in an eight hour day for 15
to 20 minutes, may frequently lift less than 10 pounds,
occasionally lift 10 pounds, rarely lift 20 pounds, and never lift 50
pounds. That he could twist frequently, occasionally stoop and
crouch, climb ladders and stairs only rarely.

(Tr. 83-84). The vocational expert responded that none of the prior work, nor the transfer work,

could be performed with those limitations. (*Id.*). Ms. Ettenberg also noted that only the

unskilled jobs that she discussed would be considered low stress jobs. (*Id.*). Finally, the

Plaintiff's attorney asked the vocational expert whether a worker missing three days out of the

month would be able sustain work. (Tr. 88). Ms. Ettenberg stated such a worker would not be

able maintain employment. (*Id.*).

## III.    MEDICAL HISTORY

Plaintiff's earliest medical records before the court are office visits with Dr. Mowery,

who has been Plaintiff's treating physician for approximately ten years. (Tr. 246, 339). The

submitted physician's notes begin with Plaintiff seeking treatment for hypertension in June,

1996. (*Id.*). Through June, 1997, Plaintiff's records show that Dr. Mowery treated Plaintiff's

hypertension by prescribing Atenolol and other medications. (*Id.*).

Plaintiff was admitted to the Northern Illinois Medical Center emergency room on

December 28, 1997, due to chest pain. (Tr. 192, 196). Plaintiff was transferred to the intensive

care unit and was later discharged on December 31, 1997. (Tr. 192, 197). Plaintiff's emergency

room tests included a CBC, a SMA 24, an EKG, and a chest X-ray. (Tr. 197). Each of

Plaintiff's test results were unremarkable, except that his EKG showed minimal ST elevation.

(*Id.*). Plaintiff's chest pains were described as very short in duration, but accompanied by

crushing pain. (Tr. 197-97). Plaintiff was given one nitroglycerin on the way to the hospital, which greatly reduced his pain. (Tr. 196).

While in the hospital for further observation, Plaintiff underwent a stress test where he exercised for five minutes and thirty seconds. (Tr. 199). Plaintiff's heart rate went up to 122, but the test was stopped because of Plaintiff's knee pain. (*Id.*). Records of Plaintiff's stress test showed that he developed some substernal discomfort with ST depression in inferolateral leads that did not resolve for about eight minutes. (*Id.*). Plaintiff was referred to Dr. Raju after the stress test, and Dr. Raju recommended catheterization. (*Id.*). When the catheterization was performed, a significant lesion in Plaintiff's circumflex artery was revealed. (*Id.*).

Plaintiff's echocardiogram of December 29, 1997, showed mild mitral insufficiency, but most results were normal. (Tr. 311). Plaintiff's right ventricular systolic pressure was noted as mildly increased, suggestive of mild pulmonary hypertension. (*Id.*). No evidence of pericardial effusion was noted. (*Id.*).

Plaintiff was transferred to Rockford for an angioplasty and stent placement on December 31, 1997. (Tr. 199). Plaintiff's procedure was successful. (Tr. 307). After the surgery, Plaintiff was urged to abstain from drinking any alcohol and smoking cigarettes. (*Id.*). He was also given a prescription for Ecotrin, Norvasc, and eight weeks worth of Ticlid. (*Id.*). Plaintiff was recommended to undergo a CBC evaluation every two weeks. (*Id.*). On discharge, Plaintiff's diagnosis was atypical chest pain, coronary artery disease, and hypertension. (*Id.*).

Plaintiff saw Dr. Mowery five times in January, 1998, following his hospital stay. (Tr. 245-46). On January 6, 1998, Dr. Mowery tentatively scheduled Plaintiff's return to work for January 19, 1998. (Tr. 245). Plaintiff completed a stress test for nine minutes on January 13, 1998, with a heart rate of 120. (*Id.*). Plaintiff reported feeling well on January 27, 1998, and the

7

doctor put Plaintiff back on Atenolol. (Tr. 244). In February and March of 1998, Plaintiff saw Dr. Mowery four times. (Tr. 244). During these visits, Dr. Mowery reported that Plaintiff's blood pressure was doing fairly well, and that Plaintiff felt better on the Atenolol. (*Id.*). Plaintiff returned to work in February of 1998 as well. (Tr. 41).

Plaintiff saw Dr. Philip Gilroy on May 2, 1998, with questions about reflux esophagitis. (Tr. 233). Plaintiff's exam revealed a small to medium sliding type hiatus hernia with mild narrowing of the distal esophagus, which is compatible with mild reflux stricture. (*Id.*). The doctor did not find evidence of active esophagitis. (*Id.*).

On June 20, 1998, Plaintiff saw Dr. Mowery with complaints of fatigue. (Tr. 243). At the visit, Plaintiff's blood pressure was stable. (*Id.*). Dr. Mowery reported that Plaintiff's blood pressure was again stable on August 15, 1998, but noted continued reflux symptoms and stamina troubles. (*Id.*). Reports of Plaintiff's visit with Dr. Mowery on October 24, 1998, mentioned only Plaintiff's continued problems with reflux. (*Id.*). Plaintiff retired from work in November, 1998, and filed for DIB. (Tr. 41).

Dr. Mowery met with Plaintiff once each in the months of December, 1998, February, 1999, March, 1999, and April, 1999. (Tr. 242). Very little was reported from the office visits, but Plaintiff appears to have made no new complaints, and his reflux and blood pressure problems were stable. (*Id.*). Dr. Mowery noted returned reflux problems in August, 1999. (Tr. 239). In December, 1999, Dr. Mowery reported that Plaintiff was doing well. (Tr. 238). In May, 2000, Plaintiff reported no complaints. (Tr. 240).

Plaintiff reported severe lower back pain to Dr. Mowery on July 26, 2000, and Dr. Mowery prescribed Flexeril and Tylenol-3. (*Id.*). In September, 2000, Plaintiff felt well. (Tr. 237). In October 2000, Plaintiff reported a sore throat and chest congestion. (*Id.*). Plaintiff was

prescribed two medications on November 12, 2000, but the records are not legible. (*Id.*). Plaintiff was prescribed Prevacid in April, 2001. (Tr. 236). Plaintiff had no complaints on June 30, 2001, and reported that the Prevacid helped with his esophagitis. (*Id.*). Plaintiff reported no chest pain. (*Id.*). In October, 2001, Plaintiff's cholesterol was still high, so he was prescribed Lipitor by Dr. Mowery. (Tr. 235). Plaintiff's cholesterol was down on January 26, 2002, and Plaintiff reported no chest pain. (Tr. 331).

An Illinois Disability Determination Service Cardiac Report form was completed for Plaintiff by Dr. Mowery in December of 2001. (Tr. 257-60). Plaintiff's diagnosis was recorded as Hypertension and Coronary Artery Disease. (*Id.*). However, no evidence of congenital heart disease, arrhythmia, or chronic heart failure were reported. (*Id.*). The report also indicated that Plaintiff had no symptoms of inadequate cardiac output, and no symptoms occurring with ordinary physical activity, and no restrictions on physical activity. (Tr. 258).

Dr. Bone, a state agency physician, completed a Residual Functional Capacity Assessment ("RFC") on January 4, 2002. (Tr. 261). Dr. Bone reported that Plaintiff could occasionally lift/push/pull fifty pounds, frequently lift twenty-five pounds, and stand/walk/sit for a total of six hours each in an eight hour workday with normal breaks. (Tr. 262). Dr. Bone noted no postural, manipulative, visual, communicative, or environmental limitations for Plaintiff. (Tr. 263-65). Dr. Bone noted that Plaintiff's allegations regarding his stamina were partially credible, but discredited to some extent given Plaintiff's ability to do yard and house work, his absence of restrictions on physical activity from his treating physician, and the office notes indicating no current cardiac complaints. (Tr. 266).

Another Illinois Disability Determination Service Cardiac Report form was completed by Dr. Mowery for Plaintiff on March 19, 2002. (Tr. 274-77). Plaintiff's diagnosis was recorded as

Hypertension and Coronary Artery Disease. (*Id.*). Once again, no evidence of congenital heart disease, arrhythmia, or chronic heart failure were noted; and Plaintiff had no symptoms of inadequate cardiac output, no symptoms occurring with ordinary physical activity, and no restrictions on physical activity. (Tr. 258).

Plaintiff underwent another stress test in September, 2002, due to excessive fatigue. (Tr. 329).[1] He exercised to 10.2 METS, after which the test was terminated due to fatigue. Plaintiff's blood pressure response was good, and he reported no chest pain symptoms. (*Id.*). No dysrhythmias were reported, and Plaintiff's functional aerobic capacity was recorded as fair. (*Id.*). Plaintiff exhibited a hypertensive response without evidence of ischemia, and ST depression in inferior leads was noted. (*Id.*).

Plaintiff completed medical testing with a Dr. Briggs for a commercial drivers fitness determination on November 15, 2002. (Tr. 189-91). Plaintiff was temporarily disqualified from receiving a license due to his hypertension and cardiac disease. (*Id.*). The doctor's report also noted wheezing and coughing, and evidence of alcohol abuse. (*Id.*).

Dr. Mowery completed a RFC for Plaintiff on December 14, 2002. (Tr. 339-342). The doctor listed Hypertension and Coronary Artery Disease as Plaintiff's primary impairments. (Tr. 339). Plaintiff's primary symptoms were listed as fatigue and shortness of breath with activity. (*Id.*). Dr. Mowery noted that Plaintiff's symptoms would occasionally interfere with Plaintiff's attention and concentration in the workplace. (Tr. 340). Dr. Mowery opined that Plaintiff could work low stress jobs, walk two blocks without rest, sit up to one hour at a time before needing to get up, stand up to thirty minutes at a time before needing a break, and sit/stand/walk for a total

---

[1] It is from this date that Plaintiff has already been awarded benefits by the ALJ. Since the alleged onset date is November, 1998, the issue in this case is whether substantial evidence exists in the record to support the ALJ's decision to deny benefits before September, 2002.

of two hours each in an eight hour day with breaks. (Tr. 341). Dr. Mowery also noted that Plaintiff would need to walk around for fifteen minutes every hour, and take unscheduled breaks once or twice a day. (*Id.*). Dr. Mowery also noted that Plaintiff could rarely lift twenty pounds, occasionally lift ten pounds, and frequently lift less than ten pounds, rarely climb ladders and stairs, and only occasionally stoop or crouch. (Tr. 341-42). Dr. Mowery estimated that Plaintiff would need three days per month for medical related absences. (Tr. 342). Concluding, Dr. Mowery stated that he thought the above limitations had affected Plaintiff since approximately 1999. (Tr. 342).

## IV.     STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however, is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Charter*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 988 F.2d 473, 487 (7th Cir. 1993); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C); *see also Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[2] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a)(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[3] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination.

---

[2]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. *See* 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[3]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. *See, e.g.,* 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

## A.    Step One: Is the claimant currently engaged in substantial gainful activity?

The ALJ found no evidence that Plaintiff had engaged in disqualifying substantial gainful activity at any time since Plaintiff alleged disability. (Tr. 23). Neither party disputes this first determination, and there is substantial evidence to support the ALJ's finding. Thus, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step One of the Analysis be affirmed.

## B.    Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis, the ALJ found that Plaintiff suffered from severe

impairments. Specifically, the ALJ found that Plaintiff suffered from coronary artery disease status post myocardial infarction and angcoplasty at the circumflex artery; hypertension; and gastroesophageal reflux disease. (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. Thus, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Two of the Analysis be affirmed.

**C.     Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?**

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in the Listing of Impairments, 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 23). The ALJ found, in one conclusory sentence, that Plaintiff's "condition has not met or equaled the requirements of any listing section since the alleged onset date." (*Id.*). As this court has seen on numerous occasions, the ALJ failed to discuss, or even cite the listing relevant to Plaintiff's disability claim. Depending on the circuit, this omission alone would dictate remand. *Compare Burnett v. Commissioner*, 220 F.3d 112, 119-20 (3d Cir. 2000)(remanding where the ALJ "'merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairments,' without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning")(*citing Clifton v. Chater*, 79 F.3d 1007, 1009)(10th Cir. 1996)), *with Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999)(holding that the conclusory form of the ALJ's decision alone does not justify remand).

However, the Seventh Circuit has not decided whether failing to discuss or even cite a Listing at Step Three justifies remand. *See Rice v. Barnhart*, No. 03-3830, slip op. at 11 (7th Cir. Sept. 14, 2004)(declining to find that failure to reference relevant listing necessitates reversal and remand); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)(stating the Seventh Circuit need not address the tension between the circuits as to whether a conclusory statement at Step Three is fatal because the ALJ's decision could not stand even if she cited the correct rule). Even though the Seventh Circuit has not provided guidance on this issue, principles of administrative law require the ALJ to rationally articulate the grounds for his/her decisions thereby building "an accurate and logical bridge from the evidence." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This then allows the court to confine review to the reasons supplied by the ALJ. *See Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

The question then remains whether this court should remand because of the ALJ's failure to cite the listing or whether this court should determine whether remand is necessary given the medical record. The latter necessitates that this court weigh evidence, which is not the role of the court in this process. However, because the findings at Step Three are so conclusory it is difficult to ascertain the process of this ALJ. Therefore, for the sake of judicial efficiency, this court will adopt a standard to handle conclusory Step Three analysis. That standard will be whether a reasonable ALJ could find that Plaintiff's impairments meet or medically equal an impairment in the listings.

Listing 4.03, *Hypertensive cardiovasuclar disease*, is evaluated under 4.02 or 4.04. Listing 4.04 is the more relevant listing. 4.04 states:

*Ischemic heart disease*, with chest discomfort associated with myocardial ischemia, as described in 4.00E3, while on a regimen of prescribed treatment (see 4.00A if there is no regimen of prescribed treatment). With one of the following:

A. Sign- or symptom-limited exercise test demonstrating at least one of the following manifestations at a workload equivalent to 5 METs or less:

1. Horizontal or downsloping depression, in the absence of digitalis glycoside therapy and/or hypokalemia, of the ST segment of at least -0.10 millivolts (-1.0 mm) in at least 3 consecutive complexes that are on a level baseline in any lead (other than aVR) and that have a typical ischemic time course of development and resolution (progression of horizontal or downsloping ST depression with exercise, and persistence of depression of at least -0.10 millivolts for at least 1 minute of recovery); or

2. An upsloping ST junction depression, in the absence of digitalis glycoside therapy and/or hypokalemia, in any lead (except aVR) of at least -0.2 millivolts or more for at least 0.08 seconds after the J junction and persisting for at least 1 minute of recovery; or

3. At least 0.1 millivolt (1 mm) ST elevation above resting baseline during both exercise and 3 or more minutes of recovery in ECG leads with low R and T waves in the leads demonstrating the ST segment displacement; or

4. Failure to increase systolic pressure by 10 mmHg, or decrease in systolic pressure below usual clinical resting level (see 4.00C2b); or

5. Documented reversible radionuclide "perfusion" (thallium[201]) defect at an exercise level equivalent to 5 METs or less; or

B. Impaired myocardial function, documented by evidence (as outlined under 4.00C3 or 4.00C4b) of hypokinetic, akinetic, or dyskinetic myocardial free wall or septal wall motion with left ventricular ejection fraction of 30 percent or less, and an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise testing would present a significant risk to the individual, and resulting in marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest; or

C. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation), and an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise testing would present a significant risk to the individual, with both 1 and 2:

1. Angiographic evidence revealing:

a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or

b. 70 percent or more narrowing of another nonbypassed coronary artery; or

c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or

d. 50 percent or more narrowing of at least 2 nonbypassed coronary arteries; or

e. Total obstruction of a bypass graft vessel; and

2. Resulting in marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest.

Plaintiff's symptoms do not appear to rise to the level of Listing 4.03/4.04. For example, Plaintiff was able to complete stress tests at workload equivalents up to 10.2 METS, while the Listing requires certain symptoms at 5 METS or less. (Tr. 329). Additionally, neither party challenges the ALJ finding under Step Three. Therefore, this court finds that no reasonable ALJ could find that Plaintiff is disabled under the Listings. Substantial evidence exists to support the ALJ's Step Three finding, and this court finds no reason to disturb it. Therefore, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Three of the Analysis be affirmed.

**D.     Step Four:  Is the claimant capable of performing work which the claimant performed in the past?**

In performing the analysis under Step Four, the ALJ determined that Plaintiff was capable of performing prior work as a tractor-trailer operator (as it exists in the region at the medium level) at all times prior to September 10, 2002, but not after that date. (Tr. 28). Before doing so, the ALJ determined Plaintiff's RFC. (*Id.*). The RFC is what a claimant can still do despite his or her limitations. *See* 20 C.F.R. §416.945. After considering the entire record, the ALJ stated that

Plaintiff's medically determinable impairments necessitated two different RFC's. Before

September 10, 2002, the ALJ found that Plaintiff's impairments precluded the following:

> lifting or carrying up to 50 pounds more than occasionally and 25
> pounds more than frequently, sitting, standing and walking
> respectively and with normal breaks for more than 6 hours each in
> an 8 hour day, climbing, balancing, kneeling, stooping, crouching,
> and/or crawling more than frequently.

(Tr. 23). Since September 10, 2002, the ALJ found that Plaintiff's impairments precluded:

> lifting or carrying up to 20 pounds more than occasionally, 10
> pounds more than frequently, standing or walking for more than 1
> hour continuously, climbing, balancing, kneeling, stooping,
> crouching, and/or crawling more than occasionally, and performing
> work which requires exposure to more than low levels of stress.

(*Id.*).

In support of the first RFC statement, the ALJ expressed that Plaintiff's described daily

activities were not limited to the extent one would expect given Plaintiff's complaints of

disabling symptoms. (Tr. 27). Specifically, the ALJ noted that Plaintiff helped with chores as

much as possible, visited friends, ran errands, took care of the family finances, went to church,

fixed things, shoveled snow, and washed cars. (*Id.*). Further, the ALJ stated that Plaintiff has

not received the type of medical treatment one would expect for a totally disabled individual,

noting that Plaintiff's treatments were generally successful and that Plaintiff's treating physicians

did not indicate that Plaintiff was disabled prior to September 10, 2002. (Tr. 27).

Using the above RFC limitations at Plaintiff's hearing, the ALJ asked the Vocational

Expert's opinion as to whether such a person could return to prior work. (Tr. 76). The expert

opined that the ALJ's first RFC hypothetical "would be at the full range of medium" and stated

that some truck driving positions (as existing regionally; not as performed by Plaintiff) could be

performed by a person with the described limitations. (*Id*.). At Plaintiff's hearing, the ALJ also inquired of the Vocational Expert about the distinction between skills required for operation of a semi-truck verses lighter driving jobs (Tr. 77, 79), and the sitting requirements of driving jobs (Tr. 82). The ALJ also questioned the Plaintiff about his past work demands. For example, the ALJ inquired into the reasons Plaintiff felt he could no longer perform his past job (Tr. 41-42) and explored the typical work duties of Plaintiff in depth. (Tr. 45-48, 63-64).

Based on the above vocational characteristics and the Plaintiff's physical limitations, the ALJ concluded that all times prior to September 10, 2002, Plaintiff could have performed his past relevant work as a truck driver. This finding of the ALJ as to Step Four of the Analysis is challenged by Plaintiff. First, Plaintiff argues that the ALJ's findings and pre-September, 2002, RFC are unsubstantiated by the record. Second, Plaintiff contends that the ALJ's interpretation of Plaintiff's past work cannot be affirmed because the ALJ's conclusion was arrived at without proper consideration of the demands of "medium" truck driving, and thus constitutes an error of law. Each argument will be addressed in turn.

## A. Substantial Evidence

Plaintiff urges the court to reverse or remand Plaintiff's case because the ALJ's findings are not supported by substantial evidence. First, Plaintiff objects to the ALJ's failure to give controlling weight to Plaintiff's treating physician's RFC assessment without adequate explanation. Second, Plaintiff argues that there is not substantial evidence in the record to support the ALJ's credibility determination.

Defendant, on the other hand, contends that substantial evidence does exist in the record to support the ALJ's decision. First, Defendant argues that the ALJ's decision to depart from Dr.

21

Mowery's RFC was not inconsistent with Plaintiff's medical records viewed as a whole. In support of this argument, Defendant points to Dr. Mowery's treatment notes, the state agency physician's report, and in particular, two prior opinions of Dr. Mowery, dated December, 2001 and March, 2002, which note no restrictions on Plaintiff's physical activities.[4] Second, Defendant argues that the ALJ's credibility finding is well-supported in the record based on Plaintiff's longitudinal medical history and Plaintiff's own testimony regarding his daily activities.

The court's own review of the record for substantial evidence supporting the ALJ's decision denying Plaintiff benefits revealed much evidence that Plaintiff could have returned to prior work as it exists in the region during the period between November, 1998 and September 10, 2002. In particular, Plaintiff's office visit records with Dr. Mowery on October 24, 1998, just days before Plaintiff retired from his job in November, do not mention any cardiac symptoms or fatigue. In fact, Plaintiff only mentioned continued problems with acid reflux. (Tr. 243). There are no medical records brought to the attention of the court for the month of November, 1998, when Plaintiff alleges the onset of his disability. Plaintiff did meet with Dr. Mowery one time in each of the months of December, 1998, February, 1999, and April, 1999, but the records from these meetings do not reflect a worsening of Plaintiff's heart condition or problems with fatigue. Instead, Plaintiff made no new complaints and his reflux and blood pressure problems were recorded as stable. (Tr. 242). Plaintiff's visits with Dr. Mowery tapered off in frequency after April, 1999, but when Plaintiff returned in August, his only complaints concerned acid reflux. (Tr. 239). Likewise, Plaintiff reported doing well in December, 1999, and again in May and

---

[4]*See* Tr. 257-58, 275-76.

September, 2000, and June, 2001. (Tr. 236, 238, 240). In October, 2001, Plaintiff was having trouble with his cholesterol levels, but Plaintiff's treatment with Lipitor was effective at bringing his cholesterol levels down by January, 2002. Plaintiff also reported no chest pains in January, 2002. (Tr. 331).

Also, as pointed out in Defendant's brief, Plaintiff's treating physician, Dr. Mowery, completed two Illinois Disability Determination Service Cardiac Reports on behalf of Plaintiff in December, 2001 and March, 2002. (Tr. 257, 274). Both of these reports indicated no restriction on Plaintiff's physical activities and indicated no symptoms of inadequate cardiac output with ordinary physical activity. In addition, on January 4, 2002, Dr. Bone, a state agency physician, found that Plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand/walk/sit for a total of six hours each in an eight hour day with normal breaks. (Tr. 262). As the court reads the record, there are no medical reports provided that indicate disabling symptoms until September, 2002, when Plaintiff returned to Dr. Mowery with complaints of excessive fatigue, which is the date that the ALJ determined that Plaintiff was entitled to DIB.

While Plaintiff insists that certain medical reports in Plaintiff's record limit the persuasiveness of the factors supporting the ALJ's decision, the court has examined these records carefully and disagrees. For example, Plaintiff relies on the findings of Dr. Raju, a specialist in cardiovascular diseases. Most of Dr. Raju's findings are laboratory reports of cholesterol screenings, and the only report where Dr. Raju engaged in commentary on Plaintiff's condition was during Plaintiff's hospitalization, before Plaintiff even alleged disability. (*See* Dr. Raju's findings, Tr. 281-314). Plaintiff's assertion that "Dr. Raju indicated that Plaintiff needed to rest every 20 minutes, for 10-15 minute long intervals. (R. 173, 175)" is not substantiated by the

23

record. (Pl's Reply Supp. Summ. J., p. 4). Pages 173 and 175 of the record are merely a

questionnaire completed by Plaintiff himself, and they do not once mention findings of Dr. Raju.

Plaintiff also heavily relies on the December, 2002, RFC of Dr. Mowery, indicating that

Plaintiff's disabling symptoms existed as far back as 1999. (Tr. 339-42). The court has

examined this RFC assessment, and notes that on the last page of the questionnaire, Dr. Mowery

is asked: "What is the earliest date that the description of symptoms and limitations in this

questionnaire applies?" (Tr. 342). Dr. Mowery responded, "~1999." (*Id.*). The court finds that

Plaintiff's reliance on this one response is exaggerated. Considering that Dr. Mowery, himself,

issued two reports in 2000 and 2001 contradicting his 2002 report, and also Plaintiff's

longitudinal record, the court finds that the ALJ's decision to not give controlling weight to one

line of Dr. Mowery's RFC reasonable. "The ALJ's reasonable resolution of conflicts in the

evidence is not subject to review, as we do not reweigh the evidence." *Pugh v. Bowen*, 870 F.2d

1271, 1274 (7th Cir. 1989).

Even though rational minds may disagree as to the outcomes flowing from testimony

presented, the court will uphold the ALJ's decision if substantial evidence underpinning it exists.

*See Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989). In this case, the court finds that

substantial evidence does exist in the record supporting the ALJ's finding that prior to

September 10, 2002, Plaintiff was capable of performing work which he performed in the past

(as it exists in the region).

B.     **The ALJ's Interpretation of Past Work**

Even barring a negative finding on their first argument, Plaintiff contends that this court

should remand Plaintiff's case because the ALJ's Step Four analysis contains errors as a matter

of law. Plaintiff maintains that the ALJ's Step Four finding is flawed because the ALJ's opinion did not address the specific duties and functions of Plaintiff's past work in order to compare them with his present physical capacity. Plaintiff cites the court to *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir. 1984), where the Seventh Circuit held "that an ALJ cannot describe a claimant's job in a generic way . . . and conclude, on the basis of the claimant's residual capacity, that she can return to her previous work." *Nolen v. Sullivan*, 939 F.2d 516 (7th Cir. 1991).

Initially, the court notes that the Plaintiff did not properly raise this issue in his Memorandum in Support of Plaintiff's Motion for Summary Judgment, but instead first raised the issue in his Reply. Nonetheless, the court has reviewed Plaintiff's argument and finds it unpersuasive. At Step Four, the burden remains with Plaintiff to prove that he is disabled within the meaning of the Act. *Steward v. Bowen*, 858 F.2d 1295 (7th Cir. 1988). In this case, Plaintiff took no steps to develop the record on cross examination by questioning the Vocational Expert about the demands involved with Plaintiff's past relevant work, nor did Plaintiff attempt to demonstrate that he could not meet these demands. Also, while the ALJ's opinion itself does not list the demands of a "medium" semi-truck driving job, the record as a whole demonstrates that the ALJ did consider the demands of Plaintiff's past relevant work by questioning both the Vocational Expert and Plaintiff about the requirements of truck driving. (Tr. 41-42, 45-48, 63-64, 77, 79, 82). As such, this court finds that the ALJ's reliance on the Vocational Expert's and Plaintiff's testimony in finding that Plaintiff could return to past work as it exists in the economy reasonable.

Finding the ALJ's decision supported by substantial evidence in the record and finding Plaintiff's arguments against the ALJ's Step Four analysis unpersuasive, it is the Magistrate

25

Judge's Report and Recommendation that the ALJ's determination as to Step Four of the

Analysis be affirmed.

## VII.   **CONCLUSION**

In accordance with the above, it is the Magistrate Judge's Report and Recommendation

that Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary

Judgment on the administrative record and pleadings be granted.


ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 10/26/04

26